Still, Carter is not guaranteed to seal the deal. Good morning. My name is Mike Heilman. I represent Sandy Miller in this case, and I want to start with basically the outset, which is the core of what this case is about, the outset of the transaction in which Sandy Miller and Tom McDonald began doing business together in this rental car company, YouSave, ultimately becomes FISNA. You know the story. YouSave was a company who had two primary shareholders from its inception. One of them was McDonald, Tom McDonald. One of them was one of his family members, Chip Tatum, and I think one of his brothers, Joe Tatum. The business wasn't doing very well, and the Tatums had taken out a 2.4 million dollar debt to get into this company and to own shares, and had a value of about $375,000 in those shares, ultimately beyond the 2.4 million. They insisted, the record's clear, they wanted out. They let Tom McDonald know very clearly they wanted out. McDonald had to find someone to get him out. He needed someone who was an executive with proven experience of dealing with car rental companies. Sandy Miller is presented to him. He doesn't know, the record's clear. He doesn't know Ultimately, they enter the agreement, which is attached and is a clear record agreement, which is called the subscription agreement. That's record at 890. In that agreement, in that agreement, they undertake to do this. Mr. Miller is going to take out a loan. That loan is for 2.7 million dollars. That loan, by the way, is equivalent to the 33 and the 34 securities acts. That loan is to be used to pay off the Tatums, 100%. The Tatums are the people who are family members of Mr. McDonald. Mr. McDonald, another step of this, which I think is very important here, Mr. McDonald had pledged his own collateral to secure the Tatums loan. When this loan comes in for Sandy Miller, the Sandy Miller loan paying off the Tatums results in the release of McDonald's collateral. That's very important in this case, factually. The key to it becomes the subscription agreement and what the obligations under that subscription agreement are. First, there's paragraph 8 of the subscription agreement. Second, paragraph 9 and then paragraph 12. Those are the key elements. Paragraph 8 specifically obligates McDonald to be a maker responsible for that note along with Sandy Miller. Paragraph 9 obligates the company, you save, Ushi is what it's referred to, and you save America to pay the obligation through payment of Sandy, paying the interest and then paying free working capital to Sandy Miller and McDonald to make this happen. That's the way the document is written. Then there's a paragraph 12 that says that McDonald's to be, and McDonald's to put himself in a position where he is jointly liable on that promissory note for Sandy Miller. So that's what the key issue is here. McDonald obligates himself to Sandy Miller. He obligates himself, and Sandy Miller's not getting in the deal without the promise. He obligates himself to be a maker so that in the event anything happens with the companies that McDonald owns, where they don't pay the debt, then McDonald's going to pay it and that's his obligation. He further agrees to indemnify Sandy Miller in the event that he's made misrepresentations to him. So with that as a crux in this case, the case moves forward, excuse me, the transaction moves forward, the note is secured, and we have two makers on a note, and we have obligations from the rental car companies to pay it off with a backup of being Mr. Tom McDonald. He's gotten a lot of benefits, he's got a lot of promises that are outstanding. In 2009 to 2010, the company goes through a reverse, the rental car company goes through a reverse merger, and for some reason, Mr. McDonald and the executive group don't disclose the fact of this agreement to the public. So they can't do it. They're basically going to be, he's going to be held liable for securities fraud, and without that, there's a problem with the Canadian authorities and with the U.S. authorities. So there becomes a huge discussion about, well, we've got to get this note with Sandy Miller paid, and Sandy is beginning to get, to receive noise. And you'll see in the record where Sandy Miller's emailing or texting, I think it's actually emailing McDonald, requesting and specifically saying, I've got, we've got to get this resolved, this is your obligation as well as mine, I'm trying to keep, you know, keep you out of it, let's get this resolved. Ultimately, a promissory, Tom McDonald insists that a promissory note be executed, and that he agrees to loan Sandy Miller a million dollars to defray the interest payments, and that that's all that's going to be done. Miller, under this duress, winds up signing the agreement. The agreement's kind of bizarre, because in all the texts and all the emails, which are clear as a bell, Mr. McDonald says, this is a loan directly from me to you. But the promissory note is signed by, is executed to a company called Summerall. Summerall is a company that is totally controlled, as the record's clear, by McDonald. Summerall is McDonald. And I go into this because the, the circular nature of the way, or the really almost fraudulent nature of the way Mr. McDonald funds this loan, is that he, he, he funds a loan first to an insurance company, Carthage Insurance, which he controls. And then that company, which he controls, sends the money over to, to Summerall, which gives it, which sends it over to, to Sandy to fund the obligation on the note. Interesting thing about that is he signs it all. He signs on behalf of everybody, except ultimately, Summerall's note is signed by Sandy Miller, and it has a new, another party who's one of his family members who, who's the controller or the manager of that LLC. I'm gonna get back to that in a minute. But the main issue, and I think the main reason why that occurs, is, is to allow Mr. McDonald to continue to practice his, his business practice of papering up, to cover up obligations that he has. So that if he pays out a million dollars, he's got a note, a promissory note coming back, which ultimately, here, it's from Carthage to him. But a promissory note coming back that he can put on his balance sheet. The, the, the court will recall in a prior case, and actually two prior cases, the Barton case and the Miller case involving McDonald, the court had held, the trial court and this court, affirmed that, that, that the court had papered up a transaction in which one of his lawyers, Kendall Moore, had received payment of compensation, and he had to, he required him to execute a promissory note that was never going to be repaid. Now I want to step back, because this is where the promissory note part of it, where there's an error in the decision of the trial court on the promissory note part of it in the, in the enforceability. And that is, no consideration. The court says there's no consideration. Excuse me, the court says there is consideration for the note, but there isn't. The obligation from McDonald to Miller existed in 2003 when that subscription agreement was entered. He agreed, if the company is not going to pay it, I'm the maker, I'm going to back this up. That's what that contract says. Interesting, they don't want to talk about the subscription agreement a lot. But in 2010, after the loan is executed, the court will see in the record that there was an amendment done to the subscription agreement. It's still in force. It's still there. There's only one provision of that subscription agreement that went away. And that was the obligation in paragraph 9 for the companies, Yousave and Ooshie and Ooshie, to repay the interest and the 25 percent of working capital. That obligation went away. The companies were going public at that point. That's right. There were some requirements where they couldn't make that payment anymore. That's correct. I mean, I guess what I'm struggling with, counsel, is how do we go beyond this promissory note, straight up promissory note case, it's a contract, I'll loan you a million dollars, you're going to repay it. I mean, that's the promissory note that we have at issue before us, right? So, how do we get beyond that and what is the evidence that all of these things are connected other than . . . I mean, I don't know the business history of these entities as you do, but I mean, how do we not just enforce this contract? The way you don't enforce the contract and the reason it's not is the loan was made as the testimony, and I think there are serious questions of fact here, that a jury . . . No, but how do we get beyond the document? The document's terms are clear. We don't go to extrinsic evidence in the usual contract case. Well, in this case, there's no merger clause, and when you get to the core of what Sumrall is, it is a sham promissory note. Well, okay, so there's no merger clause. That just means that maybe some part of the subscription agreement is back out there, but that's not the basis of the lawsuit before us, is it? The basis of the lawsuit before the court is Sumrall attempting to collect a million dollars that was loaned by McDonald to Miller, all of which is documented in the exchange between these parties. The only reason Sumrall exists is because McDonald specifically, we believe no question, specifically put it there in order to create distance and to take away the failure of . . . the lack of consideration argument. He simply funneled his money through two companies he had total control of so that Miller couldn't argue far on the face. He would be veiled behind both Sumrall and ultimately Carthage. Where's your case that says we can go beyond what the promissory note says? I mean, it says for good and valid consideration or for consideration given or whatever. That recitation, though, has been upheld under many cases, numerous ones. Where's the case law that supports this idea that underlies the theory of your case? Your Honor, I think the cases are both . . . in this case, there's cases that are cited that relate to the for consideration and due consideration being boilerplate language that the court can go beyond with proper proof of what the reality of that note was and what the source of the money is and the subterfuge behind it. In addition, Judge Reeves was faced with the exact same question in this court in the McDonald case against Sandy Miller where the same thing was on the promissory note. So Miller goes into this promissory note knowing that it's a sham and he signs the contract anyway. Is there an unclean hands problem here or something like that? I don't think so. I think the issue is this is the methodology and this is the manner in which Tom McDonald has continually done business in these companies and he forces . . . But Miller's doing business this way also. He got the money, right? He got the money. The money, though . . . He's not going to have to pay it back. He got the money. That is true. But the problem with it is that McDonald, in the way he forces the transactions to go forward, there is duress in the entry of those agreements in every single case there is and it's tracked through each of these cases and every time McDonald insists on the execution of another promissory note, which the parties know and believe is never going to be repaid by them. It's not part of what's going to be repaid. It's simply a promissory note to be put on a balance sheet to maintain his strength financially. And here, we can prove that directly by the manner . . . And the record is clear on the fact that this is McDonald who's supposed to be loaning this money. He simply says, well, we have to do it in this way because of some legalities. He says that he's got these . . . You're saying . . . I heard you say duress. You said there's duress. Yes. There's economic duress on the promissory note because the bank is getting ready . . . is calling the note and is putting pressure on Miller, forcing him to pay this money or they're going to put the note into fault. And McDonald has the money. He's supposed to pay the money. He's obligated to pay the money and Sandy Miller is stuck. Well, he's not stuck. He could have sued him on the subscription agreement and forced McDonald to pay the money. He could have, but this is a company that's trying to go forward in business. These are two executives with a company and the last thing a group of executives are going to want is litigation between them when they're trying to go forward, stock assets, new investors, everything of that nature. And ultimately, I think one of the emails that Sandy Miller sends to Tom McDonald says, I'm having real trouble with this. You're going to have to be forgiving as we always are on these transactions. And he goes forward and he says, I don't see where not doing this deal does anyone any good. I mean, the bottom line is, if he didn't do the deal, then they were going to wind up in litigation with each other over this subscription agreement, which would be the death knell in any further investment in this company. It would destroy it. Your initial time has expired, Mr. Heilman. You've saved time for rebuttal. Thank you. Thank you, Judge. Mr. Meredith. Good morning, Your Honors. May it please the Court, my name is Christopher Meredith, and my co-counsel, Ian Austin, and I represent Sumrall Capital, LLC, Trace Residential Properties, LLC, USApe Holdings, Inc., and Thomas McDonald, the appellees in this case. Your Honors, this is a summary judgment case, and the standard is whether there is a genuine issue of material fact. Mr. Heilman has given a lot of background information, but I would submit that very little of it is material to the legal issues involved in this case. The primary issue that was argued in the brief and just now is Mr. Miller's affirmative defense to the promissory note that there was lack of consideration on the basis of claim that the benefit that he received was merely payment of a preexisting obligation, and therefore, there was not sufficient consideration to support his return promise to repay the money. Under Mississippi law, the standard that you have to meet to show that lack of consideration based on a prior obligation is that the party, in this case, McDonald or Sumrall Capital, was under a subsisting legal promise to pay to Mr. Miller on January 28, 2010, $1 million in cash, and that that obligation was not changed or modified in any way under the terms of the promissory note. The district court correctly found there is zero evidence in the record that anyone owed any money to Mr. Miller on that date, let alone that it was $1 million, let alone that McDonald or Sumrall sustained this affirmative defense based on a claim of a prior existing obligation. The 2003 subscription agreement does not create any obligation on McDonald's part to Miller other than to be jointly and severally liable with him on the bank debt, and he did that by guaranteeing Mr. Miller's loan. That's undisputed. That doesn't mean that Mr. McDonald owes Mr. Miller any money. It just means he also owes the bank the money, which has nothing to do with any of the issues in this case. Frankly, Mr. Miller has failed to carry his burden of showing a genuine issue of material fact because without some evidence that Mr. McDonald owed him $1 million on that date, there was no prior obligation, and so his paying him $1 million is sufficient. It's a consideration to support the return promise to repay that money, and as the emails in the record make abundantly clear if you read through them, there is absolutely no question that this promissory note was negotiated between two sophisticated business people. Mr. Miller was represented by counsel, and it was his counsel that prepared the final draft of the promissory note, and in repeated emails, Mr. McDonald made it clear to Mr. Miller that this was a personal loan that he expected to be repaid according to its terms and that he was not willing to enter into any transaction under any other terms than those, and Mr. Miller acknowledged that, and he said, I know that. There's no intention not to repay you. I know it's a loan that has to be repaid. Mr. Miller cannot claim that he didn't think he had to repay the note. Again, there's no evidence in the record of that. The only evidence in the record clearly supports the opposite conclusion. The district court got it right. The district court correctly ruled that there was no genuine issue of material fact on this point. If I understood Mr. Heilman correctly, he said that under the subscription agreement, McDonald was jointly liable with Miller on the note? Yes, Your Honor. The subscription agreement does indicate that, because Mr. Miller is buying these shares from the company, his initial buy-in, but he's got to take out a loan to do it, and the terms of agreement were that McDonald would guarantee that loan, and that's what happened. That is what happened. Mr. McDonald did guarantee that loan as agreed, and so Mr. McDonald did have some skin in the game, and you can see that in the e-mails. Mr. Miller tells him, look, you know, the banks are coming at me. You're on this loan, too, so you better do something to help me out, and McDonald agrees to make him this loan, but says, you've got to agree to pay it back, and I want the documents to be clear. He even says, I don't want to enter into any contract that we're going to fight about later, yet here we are. Mr. McDonald told him, if you don't want to take the loan, fine. At this point, do it or don't do it. I don't really care. He was willing to take the risk that the bank calls the loan and enforces his guarantee, in case he would have had liability to the bank, but not to Mr. McDonald. That's how loan guarantees work. Again, there's no evidence that McDonald or Sumrall or anyone owed Miller any money. Now, to the issue of this loan being done in the name of Sumrall Capital, there's evidence in the record. Mr. McDonald testified that it's a special purpose entity that was created for the purpose of making the loan. That was fully disclosed. Mr. Miller's counsel is the one who made the change at the last minute in the promissory note to reflect that. Everyone understood those were the terms. There's absolutely nothing unusual about that. Special purpose entities are created all the time for the purpose of doing commercial transactions, which this was, and there's nothing Mr. Miller's pointed to, no evidence and no law that would indicate that there's anything nefarious or illegal about the way the loan was funded. Even if there was, there's no case law indicating that a defense to a loan is we go look at how the lender got the money in the first place. There's no authority for that proposition. That goes to the argument that Mr. Miller raised in his brief suggesting that illegality is a defense of the contract formation, but illegality is affirmative defense that has to be raised in a response of pleading or it's waived. Mr. Miller did not raise the defense of illegality in his answer, so it's waived, but even if it weren't, the argument that Mr. Miller is making for illegality is simply not how the doctrine works. Mississippi case law is clear that the defense only applies when it's the subject matter of the contract itself that is illegal, not that there's merely some illegal aspect of the contract. The distinction, as we cited two cases in our brief, the distinction is on the one hand a Prohibition-era case holding that an insurance contract that insures illegal liquor is void for illegality because the subject matter of the contract, the thing insured, the illegal liquor is illegal, so that contract is void for illegality. On the other hand, insuring a property that is used for prostitution is not void for illegality because there's nothing illegal about insuring a building against fire. The mere fact that the building was used for illegal purposes does not make the contract illegal. That's the difference between the subject matter being illegal and there merely being some illegal aspect of it. Here, there's no evidence that there even was any illegal aspect of this contract. The only argument is that the background of how the lender got the money may have been illegal. Again, there's no evidence of that, but even if that were true, that doesn't make the contract alone illegal because there's nothing illegal about loaning someone money and then agreeing to pay it back, which is the subject matter of this contract. And the final point on this primary claim relating to the meeting of the minds or the mutual assent, Mr. Hellman suggested that the apparel evidence rule may not apply because there's no integration clause, but that's not the law. Mississippi common law is that apparel evidence rule applies when you have an integrated contract. Yes, the presence of an integration clause or a merger clause makes crystal clear this is an integrated contract, but that's not a requirement to make an integrated contract. Under Mississippi law, it's actually the Gantt case that Mr. Miller cited in his brief says that the apparel evidence rule doesn't become applicable unless there's an integration of the agreement. That is, unless the parties have assented to a certain writing as a statement of the agreement between them. Once the parties reduce their agreement to writing, you've got an integrated agreement. The parties reduce their agreement to writing in the promissory note and the related stock pledge, which are interrelated because they refer to each other. But even if an agreement is only partially integrated, there are some matters of the only admit apparel evidence to explain missing terms, but never to contradict unambiguous ones. Perhaps the most unambiguous thing about this contract is that Sandy Miller unconditionally agreed to repay the loan. There is no evidence in the record that he didn't agree to repay it. There's been plenty of argument of counsel that he didn't think he had to repay it, but no actual evidence of that. But even if there were evidence of that, it would not be admissible to contradict the unambiguous written contract that says he agreed to repay it. So, for these reasons, the district court correctly held that there was no genuine issue of material fact and that Sumrall was entitled to judgment as a matter of law on its claims on the promissory note. Concerning Mr. Miller's counterclaims, his first counterclaim is a request for declaratory relief invalidating the note, and I think parties agree that his counterclaim on that point suffers the same fate as the primary claim because they're basically mirror images of each other. The only other counterclaim that has actually been preserved in this appeal is his counterclaim against McDonnell individually for gross, reckless, or intentional misconduct. The district court found that in its holding in granting summary judgment that Miller had not identified any duty that McDonnell allegedly owed him, had put forward no competent evidence to establish that McDonnell's actions were the proximate cause of any decrease in stock value, and no evidence to establish that McDonnell's actions were intentionally reckless. As we sit here today, Mr. Miller still has not identified any duty that McDonnell owed him or put forward or identified any competent evidence that McDonnell's actions were the proximate cause of any decrease in stock value, and has pointed to no evidence to establish that McDonnell's actions were intentionally reckless. There are some assertions in the brief that Miller, I'm sorry, that McDonnell put FISNA into bankruptcy improperly or that he didn't have meetings, corporate meetings, or didn't file annual reports with the Toronto Stock Exchange, but there's no evidence in the record that McDonnell had any obligation to do these things. He was merely one officer, one shareholder of a publicly traded company. These were corporate obligations, and regarding the filing of the bankruptcy, again, there's no evidence at all in the record that McDonnell took this action in any individual capacity. There's actually a reported case in the bankruptcy case in which the bankruptcy court found that the board of FISNA authorized the filing. It did turn out that the board authorization was not the only authorization that was needed, which is why the bankruptcy case was dismissed, but there was no finding or no indication or even suggestion that McDonnell had any hand in this or that there was anything improper or, I'm sorry, intentional or knowingly wrong about it. So once again, the district court was correct that there's no genuine issue of material fact because there's no evidence to support this counterclaim. I'll mention very quickly there are other counterclaims. Mr. Miller had asserted counterclaims for alter ego, civil conspiracy, and accounting. The district court held that those essentially were abandoned for Mr. Miller's failure to respond to the motion for summary judgment. Mr. Miller has not briefed them or argued them on appeal, so we would submit that those have been abandoned as well. And unless the court has any questions, I will get back to the balance of my time. Thank you, Mr. Meredith. Mr. Hyman for rebuttal. Thank you, Judge. I think at the very least what we have here with respect to consideration on this transaction and this loan is, first of all, a question of fact for the juror to decide at the very least as to whether or not when Tom McDonald paid the million dollars he was making a payment on a debt that he owed under the subscription agreement. They talk about and there's lots of bantering around about Mr. McDonald being a guarantor. That's not what he contracted to do. There's no document in the record that says he's a guarantor. People talk about him being a guarantor. The subscription agreement says he's a maker. He is obligated under the loan by Sandy Miller with the bank to pay that debt. He has no choice. He obligated himself as part of that deal not just to the bank. He obligated himself as part of the subscription agreement to Sandy Miller. Pure and simple. Because if he didn't make that obligation, Sandy Miller would have never gotten in this transaction. And then when he finally does make payment, he creates a sham corporation to funnel the payment through to create a promissory note to shield against the obligation, excuse me, against the defense of lack of consideration. That's what's happened here. He's committed a fraud essentially on that issue to prevent that defense. He's created a sham to prevent that defense. He shouldn't be able, excuse me, he shouldn't be allowed to get away with it, but that's exactly what he's trying to do. He's trying to use traditional black letter, well it's a promissory note, promise to pay, all of those things in light of a multitude, or excuse me, a wide myriad of evidence that it was clear that he had the obligation to make the payments, that he was protecting himself and Sandy Miller, but primarily himself when he made that payment and it was based on a prior obligation. Their arguments about consideration fail. The consideration does not exist for this loan. The loan, and he just said it and they've said it several times, and Mr. McDonald said it in the emails that are part of the record, this is a personal loan. This is a loan by me to you. Then he creates what they call a special purpose entity. What's the special purpose? The special purpose is to commit, is to create the sham. There's no purpose this entity had. The only thing that company, Sumrall, ever did, and the record's very clear on this, is transfer this money from McDonald to Sandy Miller to cover this debt. That's the only thing that company ever did. It has no other business. It never has, it never will. That's clear as a bell in the record. It's no more of a special purpose entity as Tom McDonald himself. I think the jury needs to be able to hear this evidence and deal with this and make some of these decisions for us. Now, we're hamstrung and this court knows that. Sandy Miller has the beginnings and has had some problems with dementia. He can't testify because mentally he's incapable of doing that. One of the issues we had in responding to summary judgment is we couldn't put him forward in a deposition and we couldn't have an affidavit by him because we can't present evidence by Sandy Miller. We have to do all of this through the documents that express the intent and the actual transaction that occurred in order to create and to present these questions of fact to a jury. But I think these documents and these witnesses, particularly Tom McDonald, will do that. I think we can do that without question. And I think a jury will look at it and will make the decision that there was no consideration for this loan. With respect to, and we get to the counterclaims by Miller in this case. And the primary issue there relates, first of all, obviously, to the invalidity of the loan. But second relates to the acts of McDonald. And destroying the value of FISNA. Basically the value of Miller's shares. It's interesting and the facts make very clear that McDonald is the chairman. He's chairman of the board. He runs this company. He has from the very beginning. He won't deny it. He's made it clear in his transcript. He's the one that put this company into bankruptcy. He's the one who makes decisions on whether they're going to file appropriate filings with the securities groups. And he damaged the company through the process. And he stripped all the money out of it. That's all in our briefs. That's the basis of it. The facts are there. We believe that's all we have. And we ask the court to reverse this ruling on summary judgment. All right. Thank you, Mr. Hyman. Your case and all of today's cases are under submission.